**UNITED STATES of America**

**v.**

**Michael Jon HUNTER.**

**CR. No. 97–37–N.**

United States District Court,
M.D. Alabama,
Northern Division.

Oct. 20, 1997.

Opinion Supplementing Decision
Oct. 28, 1997.

Laura L. Forehand, U.S. Attorney's Office, Montgomery, AL, for Plaintiff.

Susan Graham James, Susan G. James & Associates, Montgomery, AL, for Defendant.

## ORDER

MYRON H. THOMPSON, Chief Judge.

Defendant Michael Jon Hunter has entered a guilty plea to four counts of possession with intent to distribute various controlled substances, 21 U.S.C.A. § 841(a)(1), and a fifth count of felon in possession of firearms, 18 U.S.C.A. § 922(g)(1). Hunter is now before the court on sentencing, where two principal issues are presented: (1) whether the drug and firearms-possession counts should be grouped for purposes of calculating Hunter's sentence, pursuant to United States Sentencing Guideline § 3D1.2(c), and (2) whether Hunter's severe and longstanding drug addiction should be treated as a mitigating factor for downward departure of his sentence pursuant to Sentencing Guideline § 5K2.11 or Sentencing Guideline § 5K2.13. For the reasons that follow, the court will group all of the counts against Hunter to determine his sentence, and refuses to depart downward on the basis of his severe drug addiction.

### I. BACKGROUND

On December 14, 1996, Hunter was arrested after selling several grams of amphetamine to a confidential informant of the Prattville, Alabama police department. The transaction took place in Hunter's automobile while parked at a gas station, where Hunter was observed later that day injecting himself with narcotics. After responding to a report of Hunter's activities, the police arrested him while he was seated in his car at the gas

station. Immediately prior to his arrest, Hunter was observed with a syringe in his hand near his neck. A search incident to arrest of Hunter's car yielded approximately 70 grams of amphetamine, four grams of heroin, 30 milligrams of morphine, about $1000 in cash, and what appeared to be records of drug transactions. Authorities subsequently searched Hunter's trailer home, which was located in Smiths, Alabama, several miles away from where the December 14, 1996, incident occurred. This search uncovered, in a single dresser located in Hunter's bedroom, a loaded pistol, hundreds of plastic bags commonly associated with drug transactions, a jar containing a substance that may be used to 'cut,' or dilute, drug aliquots to increase their volume, and records of drug transactions, including lists of customers and suppliers. In addition, investigators found in Hunter's bedroom a loaded shotgun, over 100 glass vials, and syringes containing what appeared to be drug residue.

In June 1997, Hunter was indicted on five counts stemming from the December 1996 incident and the weapons discovered in the subsequent search of his residence. Count I charged Hunter with distribution of 6.7 grams of amphetamine, count II charged him with possession with intent to distribute 70.2 grams of amphetamine, count III charged him with possession with intent to distribute 4.2 grams of heroin, and count IV charged Hunter with possession with intent to distribute 30 milligrams of morphine, all in violation of 21 U.S.C.A. § 841(a)(1). In count V, Hunter was charged as a felon in possession of firearms, in violation of 18 U.S.C.A. § 922(g)(1).

On June 30, 1997, Hunter entered a plea of guilty to all five counts of the indictment, pursuant to a written plea agreement. Prior to sentencing, Hunter informed the court that he would seek a downward departure on the basis of diminished mental capacity, and sentencing was continued so that he could be evaluated by a psychologist. At the initial sentencing hearing, which took place on October 9, 1997, the psychologist who examined Hunter provided testimony regarding Hunter's severe drug addiction and its possible influence on his mental state at the time of the charged offenses. The psychologist also submitted to the court a forensic evaluation report describing his findings.

Hunter and the government disagree about two principal aspects of the calculation of Hunter's sentence under the Sentencing Guidelines. First, they dispute whether the drug possession and distribution charges, counts I–IV, should be grouped together with the firearms-possession charge, count V, for sentencing purposes pursuant to § 3D1.2(c). Second, they disagree about whether court should reduce Hunter's sentence on the basis of his severe drug addiction, under either § 5K2.11 (permitting downward departure where a defendant has committed a crime to avoid a perceived greater harm) or § 5K2.13 (permitting downward departure where defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary drug use). The court will take up these two issues in turn below.

## II. GROUPING OF OFFENSES

The question of whether the four drug counts should be grouped with the felon-in-possession-of-weapons count implicates a number of distinct provisions of the Sentencing Guidelines. As is generally true where the Guidelines are concerned, the best course of action is for the court to navigate through these provisions in a careful, step-by-step process, paying close attention to any guidance offered by the Sentencing Commission in the commentary and application notes that accompany the Guidelines.

### A.

The first step is to determine the total offense level. U.S.S.G. Ch. 2. This step involves several sub-steps, U.S.S.G. § 1B1.1, including, if there are multiple counts, a determination of whether and how the counts should be grouped. Part D of Chapter Three of the Sentencing Guidelines "provides rules for determining a single offense level that encompasses all the counts of which the defendant is convicted." "Some offenses," according to Part D, "that may be charged in multiple-count indictments are so closely intertwined with other offenses that conviction

for them ordinarily would not warrant increasing the guideline range." For example, Part D continues,

> "[Some] offenses ... are so closely related to the more serious offense that it would be appropriate to treat them as part of the more serious offense, leaving the sentence enhancement to result from application of a specific offense characteristic.... Convictions on multiple counts do not result in a sentence enhancement unless they represent additional conduct that is not otherwise accounted for by the guidelines. In essence, counts that are grouped together are treated as constituting a single offense for purposes of the guidelines."

One manner of grouping, and the one at issue here, is that: "When offenses are closely interrelated, group them together for purposes of the multiple-count rules, and use only the offense level for the most serious offense in that group." U.S.S.G. Ch.3, Pt. D.

Pursuant to Part D of Chapter Three of the Sentencing Guidelines, § 3D1.1 provides, among other things, that, "When a defendant has been convicted of more than one count, the court shall," first, "Group the counts resulting in conviction into distinct Groups of Closely–Related Counts ... by applying the rules specified in § 3D1.2," and, second, "Determine the offense level applicable to each Group by applying the rules specified in § 3D1.3."

### B.

Therefore, analysis of the grouping question presented here begins with § 3D1.2, which directs the court to group separate counts when they "involve substantially the same harm." The provision goes on to explain that this requirement is satisfied when, among other possibilities, "one of the counts embodies conduct that is treated as a specific offence characteristic in, or other adjustment to, the guideline applicable to another of the counts." U.S.S.G. § 3D1.2(c). The parties agree that it is on the basis of this provision that grouping, if proper, would rest.

The commentary to § 3D1.2 explains that subpart (c) of this section "provides that when conduct that represents a separate count ... is also a specific offense characteristic in or other adjustment to another count, the count represented by that conduct is to be grouped with the count to which it constitutes an aggravating factor." U.S. Sentencing Guidelines Manual § 3D1.2, comment. (n.5) (1995). Thus, in determining whether to apply § 3D1.2(c), the court is to examine the relationship between the charged conduct in a particular count and the "specific offense characteristics," or aggravating factors, set forth in the Guidelines for the other count. If the court determines that the charged conduct underlying the first count would qualify as a special offense characteristic of the other count, § 3D1.2(c) mandates that the counts be treated as a single group, rather than separately, to prevent "double counting." *See id.* An example of such double counting would arise, to borrow a scenario from the commentary to § 3D1.2(c), if a defendant convicted of one count of securities fraud and one count of bribing an official to obstruct the investigation into the fraud offense were to be sentenced separately for both offenses, and at the same time the fraud sentence were enhanced by two levels based upon the bribe. To prevent such a result, the Guidelines provide for the grouping of counts as described above, and set forth in § 3D1.3 a method for determining the sentence for grouped counts based upon the offense level applicable to only the most serious count.[1] *See* U.S.S.G. § 3D1.3(a).

To apply these grouping rules to the facts presented here, the court must first carefully

---

**1.** If the counts were not grouped in this fashion, but instead were treated separately in calculating the overall sentence, § 3D1.4 would operate to increase the offense level of the most serious count due to the presence of the additional, less serious, counts. Such an increase in the overall sentence would constitute double counting, because it would come on top of an enhancement of the offense level of the most serious count that already had been imposed because the less serious counts constituted specific offense characteristics of the more serious count. The grouping of closely-related counts eliminates such double counting because the sentence is determined by the offense level of the most serious count without an additional penalty imposed under § 3D1.4 due to the other counts.

consider the relationship between the charged conduct in Hunter's drug counts and that in his firearms-possession count, and ascertain whether the conduct in the drug counts constitutes a specific offense characteristic of the weapons count, or conversely, whether the conduct underlying the weapons count is a specific offense characteristic of the drug counts. The United States Probation Officer who prepared Hunter's pre-sentence report concluded that all counts against Hunter should be grouped for sentencing. Hunter disagrees, contending that there is an insufficient nexus between the drug and weapons charges to consider the conduct underlying the drug charges as a specific offense characteristic of the weapons charge, or vice versa.[2]

To resolve this dispute, the court must first examine the provision of the Guidelines governing Hunter's sentence on the drug possession and distribution counts, § 2D1.1. Subpart (b)(1) of this provision establishes that one possible "specific offense characteristic" of the drug counts is the defendant's possession of a dangerous weapon, specifying that "If a dangerous weapon (including a firearm) was possessed, increase [the offense level] by 2 levels." U.S.S.G. § 2D1.1(b)(1) (1995). Thus, it appears at first blush that Hunter's possession of the firearms that led to his guilty plea on count V indeed qualifies as a specific offense characteristic of his drug counts, justifying grouping of the counts. While this conclusion does turn out to be correct, the analysis is not as straightforward as it originally appears. In fact, as explained below, only by applying the provisions in the Guidelines pertaining to "relevant conduct" may the court conclude that the firearms-possession charge does in fact constitute a specific offense characteristic of the drug charges, and by extension that grouping of counts is proper.

Application Note 3 in the commentary to § 2D1.1(b)(1) sheds some light on the scope and purpose of the provision:

"The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. *The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense.* For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet."

U.S. Sentencing Guidelines Manual § 2D1.1, comment. (n.3) (1995) (emphasis added). A plain reading of this commentary suggests that conduct involving a weapon will constitute a specific offense characteristic of a drug offense only when the weapon was actually possessed at the site at which the charged offense occurred, that is, when "the weapon was present." Under this interpretation of § 2D1.1(b)(1), Hunter's firearms-possession charge would not appear to constitute a specific offense characteristic of the drug charges, because the guns were not present at the site of the charged drug transaction, but instead were located at his residence, miles away from where the transaction took place.

However, the Sentencing Commission has made it clear that possession of the weapon at the site of the offense conduct is not a strict requirement for a sentence enhancement under § 2D1.1(b)(1). Instead, the Commission has stated that the defendant's possession of the dangerous weapon where relevant conduct, as defined in § 1B1.3, has taken place justifies such a sentence enhancement. This statement was made by the Commission in connection with a 1991 amendment to the Guidelines, in which the phrase "during commission of the offense" was deleted from § 2D1.1(b)(1) immediately after the word "possessed." The Commission explained that this change was intended to clarify that the provisions of § 1B1.3 (a)(2), dealing with relevant conduct for purposes of determining the guideline sentencing range, apply to the adjustment set forth in § 2D1.1(b)(1) for possession of a danger-

---

2. The government initially agreed with the probation officer's recommendation, but eventually conceded at the initial sentencing hearing that the drug and weapons charges should not be grouped, because the weapons were not associated with the specific conduct underlying the drug counts.

ous weapon. *See* U.S. Sentencing Guidelines Manual app. C, at amendment 394.

To fully understand the consequences to Hunter's sentence of this relationship between §§ 1B1.3(a)(2) and 2D1.1(b)(1), the court must turn to § 1B1.3. This provision states in pertinent part:

> "(a) *Chapters Two (Offense Conduct) and Three (Adjustments )*. Unless otherwise specified, . . . specific offense characteristics . . . shall be determined on the basis of the following:
>
> (1) (A) all acts and omissions committed . . . by the defendant; and
>
> . . .
>
> (2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivision[ ] (1)(A) . . . above that were part of the same course of conduct or common scheme or plan as the offense of conviction."

Thus, the provisions of § 1B1.3(a)(2) referenced in the commission's Explanation of its amendment to § 2D1.1(b)(1) establish, among other things, the conduct that may be used by the court to determine the specific offense characteristics of the charged offense. According to § 1B1.3(a)(2), for those offenses that are subject to grouping under § 3D1.2(d),[3] the nature of conduct that was part of the same course of conduct, or common scheme or plan, as the charged offense may be considered in determining the specific offense characteristics of the charged offense.

Thus, to determine the specific offense characteristics of Hunter's drug offenses, this court should examine all of Hunter's conduct that it deems was part of the same course of conduct, or common scheme or plan, as the charged drug offenses. More to the point, under the amended § 2D1.1(b)(1), the court should find that Hunter's firearms-possession charge is a specific offense characteristic of, and therefore groupable with, the drug of-fenses if Hunter possessed the weapons while undertaking any conduct relevant to the drug offenses, as such relevant conduct is defined by § 1B1.3(a)(2). Simply put, this means that Hunter need not have actually possessed his weapons at the site of the offense conduct for § 2D1.1(b)(1) to apply, but rather that the sentence enhancement is appropriate if Hunter possessed the weapons where he undertook any relevant conduct related to the drug offenses, even though such conduct did not by itself lead to a conviction.

This expansive interpretation of § 2D1.1(b)(1) to encompass cases where a weapon was possessed not at the site of the offense conduct, but at a remote location where relevant conduct occurred, may initially appear to be at odds with the commentary in Application Note 5, quoted above, which states that the enhancement should be applied "if the weapon was *present.*" *See* U.S. Sentencing Guidelines Manual § 2D1.1(b)(1) comment. (n.5) (1995). This commentary was not revised when § 2D1.1(b)(1) was amended to clarify that possession of a weapon where relevant conduct occurs falls within the purview of this provision. However, because Application Note 5 requires merely that the weapon be "present," and not that it be "present at the site of the charged offense conduct," it is reasonable to construe this language to encompass situations where the weapon is "present" at the site of relevant conduct, even though such conduct takes place at a location remote from the site of the conduct that led to conviction.

Moreover, the courts of appeals that have addressed this issue have been unconcerned with any apparent tension between the language in Application Note 5 and the interpretation of § 2D1.1(b)(1) as encompassing possession of a weapon where relevant conduct occurred. Instead, the decisions of these courts are consistent with the analysis set forth above. *See, e.g., United States v.*

---

**3.** The drug offenses to which Hunter pled guilty are offenses that are to be grouped under § 3D1.2(d). *See* § 3D1.2(d) (listing § 2D1.1 offenses as subject to grouping) In fact, Hunter's, sentence on the four drug counts is determined by grouping the counts and pooling all of the quantities of drugs involved to arrive at a total amount of drugs, which is then converted to equivalents of marijuana for purposes of assigning a base offense level. *See* U.S.S.G. §§ 2D1.1 comment. (examples a. to d.) and 3D1.2(d).

*Adams,* 125 F.3d 586 (7th Cir.1997) (under § 2D1.1(b)(1), "the government is not required to show that the weapon was present during a specific drug trafficking offense . . . only that the weapon was possessed during any relevant conduct"); *United States v. Mumford,* 25 F.3d 461, 468 (7th Cir.1994) (holding that enhancement is proper "where the defendant is accountable for the possession of a weapon by a co-conspirator during drug trafficking conduct relevant to the offense conviction, of which the defendant was charged but not convicted, even where the weapon was not present during the offense of conviction"); *United States v. Roederer,* 11 F.3d 973, 981–82 (10th Cir.1993) (holding that enhancement was applicable to a drug-trafficking offense that occurred in defendant's automobile, despite fact that the only weapon was found in his residence, where government introduced evidence establishing that the defendant engaged in relevant, but uncharged, conduct at his residence); *United States v. Falesbork,* 5 F.3d 715, 721 (4th Cir.1993) (holding that the court must look to all relevant conduct in determining the sentence, including possession of a gun while engaging in drug sales related to, though distinct from, the crime of conviction).

Applying the foregoing principles to the facts presented here, the court has no difficulty concluding that Hunter possessed his weapon in connection with relevant conduct, as defined in § 1B1.3 (a)(2), related to the counts of drug possession and distribution to which he pled guilty. The government has established, via evidence obtained from Hunter's residence and testimony by the investigating officer of the Prattville police, that Hunter had been engaging in drug-trafficking activities out of his residence at the time of his arrest for the instant offenses. Such evidence includes the discovery at Hunter's residence of such drug-trafficking appurtenances as a 'Rolodex' telephone index listing the names of known drug suppliers, records of drug transactions, several hundreds of plastic containers of a type frequently used for packaging drugs for illicit sales, and a large quantity of a powdery substance that the investigating officer testified was likely to have been used as a "cutting agent," or inert substance used to increase the volume of drugs to maximize the profit potential of a given quantity of drugs. Thus, the overwhelming weight of the uncontradicted evidence presented by the government at sentencing indicates that Hunter had been engaging in drug-distribution activities at his residence around the time that he was arrested on the instant charges.

Further, the court finds that these drug-trafficking activities and the December 14, 1996, drug transaction that led to Hunter's guilty plea on counts I-IV were part of a "common scheme or plan," as contemplated by § 1B1.3 (a)(2), because they reflected the common purpose of selling drugs for profit to individuals in the central Alabama area. *See* U.S. Sentencing Guidelines Manual § 1B1.3(a)(2) comment. (n.9(A)) (1995) ("For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, *common purpose,* or similar *modus operandi.*") (emphasis added). In addition, the court notes that Hunter's firearms were discovered in the same room of his trailer home that contained the majority of the drug-trafficking instruments found at the home. In fact, Hunter's pistol was in the very dresser that contained the plastic drug containers, needles, apparent cutting agent, and 'Rolodex' file discussed above.

■ Accordingly, the court concludes that Hunter did indeed possess his weapons during the commission of conduct relevant to the drug offenses to which he pled guilty, and so the two-level enhancement applies to his sentence pursuant to § 2D1.1(b)(1). Thus, the court finds that the conduct underlying Hunter's firearms-possession charge is a specific offense characteristic of his drug offenses and, pursuant to § 3D1.2(c), the firearms-possession and drug charges will be grouped together for purposes of determining his sentence under the Guidelines.

Although this outcome may appear on the surface to be at odds with a recent Eleventh Circuit decision, *United States v. Cooper,* 111 F.3d 845 (11th Cir.1997), closer examination of that case dissolves any apparent inconsistency. In *Cooper,* the court explained that

§ 2D1.1(b)(1) requires that the government show by a preponderance of the evidence that the firearm was "present at the site of the charged conduct." *Id.* at 847. While this holding may be read to require that the weapon be possessed during commission, and at the location, of the charged offense, the scope of the *Cooper* holding is circumscribed by the fact that the court did not consider, because it was unnecessary, the role that relevant conduct is to play in applying § 2D1.1(b)(1). Thus, it is inappropriate to read *Cooper* to exclude from consideration in applying § 2D1.1(b)(1) weapons possessed by the defendant during the course of relevant, but uncharged, conduct that took place at a remote location relative to where the offense conduct occurred.

In *Cooper,* the Eleventh Circuit reversed the district court's enhancement of the defendant's sentence based upon weapons found not at the location at which the narcotics underlying the drug charge were found, but rather at the defendant's residence. The defendant had been sentenced on a charge of possession with intent to distribute cocaine based upon drugs concealed in a suitcase uncovered at a "mini-warehouse" rented by the defendant's wife. A subsequent search of the defendant's residence had yielded two pistols, as well as a suitcase similar to the one found at the mini-warehouse, additional cash, a key to the mini-warehouse, steroids and electronic 'bug'-detection equipment. However, no drug paraphernalia or other indicia of drug use or, more importantly, drug trafficking were uncovered at the home where the weapons were found. Nor was there any evidence that drug transactions took place in or originated from the residence. Thus, in *Cooper,* unlike in the case at bar, the Eleventh Circuit was not required to reach the question of whether relevant conduct occurring where the weapons were found could support an enhancement of the drug-offense sentence under § 2D1.1(b)(1). Accordingly, that decision should not be read to exclude such a possibility where, as here, the facts and circumstances of a case counsel application of relevant conduct principles, as contemplated by the Sentencing Commission.

For the foregoing reasons, the court will group all five counts to which Hunter pled guilty in determining his sentence. As a result, the court need not ascertain whether grouping is proper for the alternative reason that Hunter's drug-offense conduct constitutes a specific offense characteristic of his firearms-possession charge. However, this question is closely related to the one issue that remains regarding the calculation of Hunter's sentence range under the Guidelines. Specifically, the court must determine whether in calculating Hunter's sentence for the firearms-possession count an enhancement should be applied because his weapons were possessed in connection with his drug-trafficking activities. As the court will explain in the next section, this issue must be resolved, despite the fact that all five counts must be grouped, because Hunter's sentence must be based upon the most serious of the counts he faces, which here turns out to be the firearms-possession count.

### C.

As stated, § 3D1.1 provides, among other things, that, "When a defendant has been convicted of more than one count, the court shall," first, "Group the counts resulting in conviction into distinct Groups of Closely–Related Counts ... by applying the rules specified in § 3D1.2," and, second, "Determine the offense level applicable to each Group by applying the rules specified in § 3D1.3." Having resolved that the five counts should be grouped, the court now turns to Sentencing Guideline § 3D1.3, which provides in relevant part that, "In the case of counts grouped together pursuant to § 3D1.2(a)–(c), the offense level applicable to a Group is the offense level, determined in accordance with Chapter Two and Parts A, B, and C of Chapter Three, for the most serious of the counts comprising the Group, i.e., the highest offense level of the counts in the Group."

Application of § 3D1.3 requires the court to consider § 2K2.1, which governs the calculation of Hunter's sentence for the firearms-possession charge, and specifically subpart (b)(5) of that provision, which provides for a four-level enhancement "If the defendant

used or possessèd any firearm ... in connection with another felony offense," because if Hunter receives this enhancement, the firearms-possession count will be the most severe offense under § 3D1.3. The commentary to this provision expressly defines the term "felony offense" as used in § 2K2.1(b)(5) as "any offense (federal, state, or local) punishable by imprisonment for a term exceeding one year, whether or not a criminal charge was brought, or conviction obtained." U.S. Sentencing Guidelines Manual § 2K2.1 comment. (n.7) (1995).

In light of this definition, to apply § 2K2.1(b)(5) to the instant facts, the court must make two determinations: (1) whether Hunter's drug-trafficking activities at his residence constitute uncharged federal, state or local offenses that would be punishable by imprisonment for a one-year or greater term, and (2) whether the weapons were possessed "in connection with" the drug activities, as required by the express language of § 2K2.1(b)(5).

■ The court concludes, on the basis of the evidence described above, that Hunter's drug-trafficking activities at his residence were indeed uncharged felony offenses, punishable by a one-year or greater term of imprisonment, under federal law, including the provisions of 21 U.S.C.A. § 841(a)(1). As described above, such activities constitute conduct relevant to the drug offenses to which he pled guilty. The second requirement, that Hunter possessed his weapons "in connection with" such activities, raises a somewhat more difficult question. As explained more fully above, the court has already concluded that Hunter possessed his weapons at the location, and during the commission, of his at-home drug activities, satisfying the Guidelines' grouping requirements. However, it is not immediately obvious whether this nexus between the weapons and drug activities is sufficient to satisfy the "possessed ... in connection with" require-

ment imposed by § 2K2.1(b)(5) for enhancement of the firearms-possession sentence because of the drug-related activities.

The Eleventh Circuit Court of Appeals has noted, without staking out its own position, an apparent split in its sister circuits on the issue of whether § 2D1.2(b)(1) and § 2K2.1(b)(5) impose the same standard for finding that the relationship between possession of a weapon and drug activities warrants a sentence enhancement. See United States v. Whitfield, 50 F.3d 947, 948–49 (11th Cir.), cert. denied, —— U.S. ——, 116 S.Ct. 234, 133 L.Ed.2d 163 (1995). In Whitfield, the court noted that most circuits[4] apply a relatively stringent standard, holding by analogy to 18 U.S.C.A. § 924(c)[5] that a showing of more than "mere possession" of a firearm is required to obtain a § 2K2.1(b)(5) enhancement, while the Fifth Circuit applies a more lenient standard analogous to that imposed by § 2D1.1(b)(1), as described above. 50 F.3d at 948–949. Courts applying the more stringent standard require that the government establish that the weapon " 'was possessed in a manner that permits an inference that it facilitated or potentially facilitated— i.e., had some potential emboldening role in—a defendant's felonious conduct.' " Id. at 948 (quoting United States v. Routon, 25 F.3d 815, 819 (9th Cir.1994)); cf. Smith v. United States, 508 U.S. 223, 238, 113 S.Ct. 2050, 2059, 124 L.Ed.2d 138 (1993) (holding that the phrase "in relation to" in 18 U.S.C.A. § 924(c)(1) requires that the weapon facilitate or have the potential to facilitate a drug-trafficking offense). The Eleventh Circuit remarked in Whitfield, however, that in practice courts tend to reach similar conclusions even when applying the theoretically distinct standards described above, and the court declined to decide between the competing legal benchmarks because it found that the district court's decision was not clearly erroneous under either standard.[6] Id. at 949.

---

4. To date, the Court of Appeals for the First, Second, Fourth, Seventh, Ninth and Tenth Circuits have adopted this standard See United States v. Spurgeon, 117 F.3d 641, 643–44 (2d Cir.1997) (and cases cited therein).

5. 18 U.S.C.A. § 924(c) mandates an enhanced sentence for a defendant who "uses or carries a firearm" during and in relation to any federal crime of violence or drug-trafficking offense.

6. Recently, in United States v. Young, 115 F.3d 834 (11th Cir.1997), the Eleventh Circuit ad-

■ This court, like the Eleventh Circuit in *Whitfield*, need not decide which of the competing standards to employ here in determining whether to enhance Hunter's sentence pursuant to § 2K2.1(b)(5). This is true because under even the more stringent test developed by analogy to 18 U.S.C.A. § 924(c)—whether an inference may be drawn that Hunter's possession of his weapons "facilitated or potentially facilitated" his drug-trafficking activities at home—the court finds that Hunter did in fact possess his guns "in connection with" such activities. Specifically, the court concludes that given the presence of both the guns and the instrumentalities of drug trafficking in the same room of Hunter's residence, with the pistol located in the very dresser in which various drug containers and records were found, at the very least those weapons potentially facilitated Hunter's drug-distribution activities. Hunter would have been comforted by the knowledge that he enjoyed easy access to the loaded weapons should any perceived need to defend himself or otherwise further his felonious activities arise. *See Spurgeon*, 117 F.3d at 643 (presence of a weapon in same location as drug paraphernalia, coupled with defendant's statement that the weapon was for his protection, satisfied more stringent test for application of the § 2K2.1(b)(5) enhancement).

Accordingly, the court finds that Hunter's sentence on count V, possession of a weapon by a felon, must be enhanced by four levels pursuant to § 2K2.1(b)(5) because he possessed his two guns in connection with the drug-trafficking activities that took place at his residence.

For all of the foregoing reasons, the court will adopt the sentencing range recommended by the United States Probation Officer in the pre-sentence report, which properly was determined based upon the grouping of all counts against Hunter, and correctly included the four-level enhancement of the firearms-possession count pursuant to § 2K2.1(b)(5).

### III. DOWNWARD DEPARTURE BASED ON HUNTER'S SEVERE DRUG ADDICTION

The second disputed aspect of Hunter's sentencing concerns whether the court should depart downward from the sentence range imposed by the Sentencing Guideline because Hunter suffered from a chronic and severe addiction to narcotics at the time of the charged offense. As explained above, Hunter relies on two policy statements within the Guidelines, set forth in Sentencing Guideline § 5K2.11 and Sentencing Guideline § 5K2.13, in support of his argument that his sentence should be reduced due to his addiction. The government disagrees, asserting that Hunter is not eligible for a reduced sentence because his drug addiction has its genesis in a voluntary, as opposed to involuntary, act.

### A.

■ Hunter's claim based on § 5K2.11 of the Guidelines may be disposed of with little

---

dressed the meaning of language analogous to the "possessed ... in connection with" phrase of § 2K2.3(b)(5). Specifically, the *Young* court interpreted § 4B1.4(b)(3)(A), which concerns the sentencing of armed career criminals who "used or possessed [firearms] in connection with a crime of violence or controlled substance offense." Noting once again the split in circuit authority regarding § 2K2.1(b)(5), the court on this occasion appeared to adopt the minority position of the Fifth Circuit, which analyzes the "possessed ... in connection with" language by analogy to § 2D1.1(b)(1), rather than by using the more stringent test based on an analogy to 18 U.S.C.A. § 924(c). *Id.* at 837–38 (citing *United States v. Guerrero*, 5 F.3d 868, 872 (5th Cir.1993), *cert. denied*, 510 U.S. 1134, 114 S.Ct. 1111, 127 L.Ed.2d 422 (1994)).

However, this court does not believe that *Young* should be read as establishing that the Eleventh Circuit has adopted the Fifth Circuit's less stringent test for permitting an enhancement under § 2K2.1(b)(5). Rather, *Young* should be understood as limited to § 4B1.4(b)(3), because the court expressly noted in adopting the Fifth Circuit's test in *Guerrero* that that circuit "is the only circuit to interpret the specific language of U.S.S.G. § 4B1.4(b)(3)(A)," and because the interpretation of this particular provision was the actual issue presented to the court in *Young*. *Id.* at 838. In any event, as explained below, this court need not actually address whether the Eleventh Circuit has adopted the less stringent standard for applying § 2K2.1(b)(5) because it finds on the record before it that both competing legal standards counsel application of the enhancement here.

difficulty. That provision provides, in pertinent part:

"Sometimes, a defendant may commit a crime in order to avoid a perceived greater harm. In such instances, a reduced sentence may be appropriate, provided that the circumstances significantly diminish society's interest in punishing the conduct, for example, in the case of a mercy killing. Where the interest in punishment or deterrence is not reduced, a reduction in sentence is not warranted. For example, providing defense secrets to a hostile power should receive no lesser punishment simply because the defendant believed that the government's policies were misdirected...."

Despite the paucity of decisions addressing the application of this provision, the court sees no impediment to concluding that Hunter's sentence should not be reduced simply because he sold drugs to support his all-consuming drug habit. At base, Hunter's argument under § 5K2.11 is that he engaged in drug dealings so that he could buy drugs for his own use and so avoid the perceived greater harm imposed by the severely uncomfortable symptoms of withdrawal he would suffer absent a steady infusion of new drugs. By the express language of § 5K2.11, for Hunter to be entitled to a level decrease the court must find that these circumstances "significantly diminish society's interest in punishing" Hunter's conduct. The court is unwilling to reach this conclusion on the record before it. Perhaps the most important consideration underlying the court's decision is that Hunter could have sought treatment for his addiction at any time, rather than engage in conduct that he knew was illegal to support his addiction. The record shows that Hunter did in fact succeed for a short period of time in eliminating addictive drugs from his life, and he once voluntarily entered a drug treatment program. While the testimony and forensic report of the examining psychologist paints an unsettling picture of Hunter as a chronically and severely drug-addicted individual, the psychologist made a point of confirming that Hunter could have attempted to seek treatment for his condition if he so desired. Unfortunately, he opted instead to engage in illegal activities, under circumstances that certainly do not decrease the societal interest in deterrence and punishment. Hunter is not entitled to relief under § 5K2.11 because of his drug addiction.

This conclusion is bolstered by the First Circuit's careful examination of § 5K2.11 in *United States v. Carvell,* 74 F.3d 8, 11–12 (1st Cir.1996), which addressed the applicability of this provision to a defendant who cultivated marijuana for his own use in staving off depression and suicidal tendencies. Although the court ruled that a downward departure grounded on § 5K2.11 would be appropriate in such circumstances, the court was explicit in its conclusion that "in the ordinary drug dependence case" society's interest in punishment or deterrence of drug offenses would not be diminished except under extraordinary circumstances. *Id.* at 12. The First Circuit explained this conclusion as follows:

"The Commission has specified that society's interest in punishment and deterrence outweighs the 'drugs made me do it' excuse for crimes committed to feed drug habits or while under the influence of drugs. U.S.S.G. § 5H1.4, p.s. Moreover, claims of being driven to drugs by the habituation of prior drug use, disadvantaged upbringing or poor socioeconomic life conditions have been weighed by the Commission and found insufficient ordinarily to overcome the societal interest in deterrence and punishment. U.S.S.G. §§ 5H1.4, p.s., 5H1.10, p.s. & 5H1.12, p.s."

Section 5H1.4, cited by the *Carvell* court, states in pertinent part that "Drug or alcohol dependence or abuse is not a reason for imposing a sentence below the guidelines."

This court agrees with the First Circuit's analysis of the interplay between § 5K2.11, § 5H1.4, and pleas for sentence reduction grounded on the defendant's addiction to drugs, and finds that the circumstances of Hunter's drug addiction are insufficiently unusual and extreme to warrant a departure under § 5K2.11. In contrast to the defendant in *Carvell,* Hunter did not perceive that the "greater harm" he faced was the taking of his own life, nor did he reasonably believe

that selling drugs to support his habit was the only way that he could avoid that perceived greater harm. *See Carvell,* 74 F.3d at 12. Consequently, the court sees no basis for concluding that it is presented with an extraordinary case here, and finds that a downward departure is not justified.

### B.

Regarding Hunter's alternative argument for a sentence reduction, based upon § 5K2.13, the court reaches a similar conclusion. This provision of the Guidelines provides:

> "If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public."

U.S.S.G. § 5K2.13. Hunter must clear two significant hurdles to establish his eligibility for such a downward departure: (1) that the charged offenses were "non-violent," and (2) that the court is not precluded from departing downward pursuant to § 5K2.13 because Hunter's alleged diminished capacity stems from his admitted drug addiction.

■ Hunter has established that the charged offenses were nonviolent, for purposes of § 5K2.13. Although the court has found no case law specifically addressing this issue, it concludes that the drug offenses should not be deemed crimes of violence because the Guidelines themselves treat "controlled substance offenses" and "crime[s] of violence" as distinct categories in § 4B1.4(b)(3)(A), pertaining to armed career criminal offenders, and because Congress has also separately categorized "crime[s] of violence" and "drug trafficking crimes" in 18 U.S.C.A. § 924, concerning penalties for firearms offenses. Of course, the court recognizes that a drug offense may also be a crime of violence under certain circumstances, but it concludes that such circumstances are not present here, and the provisions cited above establish that a drug offense is not *per se* a crime of violence.

Additionally, the court finds that under the Sentencing Guidelines the charge of weapon possession by a felon is not a crime of violence. *See* U.S. Sentencing Guidelines Manual § 4B1.2 comment. (n.2) ("The term 'crime of violence' does not include the offense of unlawful possession of a firearm by a felon. Where the instant offense is unlawful possession of a firearm by a felon, § 2K2.1 ... provides an increase in offense level if the defendant has one or more prior felony convictions for a crime of violence or controlled substance offence."); *see also United States v. Dailey,* 24 F.3d 1323, 1327 (11th Cir.1994) (holding that "crimes of violence" under § 4B1.2 and "non-violent offenses" under § 5K2.13 are mutually exclusive categories).

■ Hunter is on shakier ground regarding the second requirement, that he demonstrate that his diminished capacity is not due to voluntary drug use. Hunter's argument on this point is derailed by § 5H1.4, which, as noted above, states in pertinent part: "Drug or alcohol dependence or abuse is not a reason for imposing a sentence below the guidelines." Courts have implemented this unambiguous directive in the context of § 5K2.13 by refusing to depart downward where a defendant's alleged diminished capacity exclusively is due to drug addiction, even though once addicted an individual can no longer be deemed to be 'voluntarily' using drugs. *See United States v. Kennedy,* 32 F.3d 876, 887 n. 2 (4th Cir.1994), *cert. denied sub nom. Ingram v. U.S.,* 513 U.S. 1128, 115 S.Ct. 939, 130 L.Ed.2d 883 (1995); *United States v. Anders,* 956 F.2d 907, 912 (9th Cir.1992), *cert. denied,* 507 U.S. 989, 113 S.Ct. 1592, 123 L.Ed.2d 158 (1993). However, where the addiction was the result of pre-existing mental illness, *see United States v. Cantu,* 12 F.3d 1506, 1514–15 (9th Cir.1993), or was not the sole cause of the defendant's impaired mental capacity, but may have acted in addition to, or in concert with, a different source, downward departure may be permitted, *see United States v. McMurray,* 833 F.Supp. 1454, 1484 (D.Neb.1993), *aff'd,* 34 F.3d 1405 (8th Cir.1994), *cert. denied,* 513 U.S. 1179, 115 S.Ct. 1164, 130 L.Ed.2d 1119

(1995); *United States v. Speight,* 726 F.Supp. 861, 867–68 (D.D.C.1989).

Here, both the psychologist's forensic report and his testimony at the initial sentencing hearing establish that the sole source of Hunter's alleged diminished capacity at the time of the offense was his longstanding addiction to heroin and other drugs. The psychological evaluation revealed no other signs of mental illness or psychosis. Therefore, in light of the case law described above, downward departure is not warranted here, where Hunter's drug addiction appears to be the exclusive cause of his alleged diminished capacity.

In a misguided attempt to avoid this result, Hunter argues that *United States v. Bass,* 490 F.2d 846, 849 (5th Cir.1974) establishes that his continued use of addictive drugs is involuntary, so that a downward departure pursuant to § 5K2.13 is permitted. Unfortunately, in proffering this wishful argument Hunter completely ignores the cases cited above which establish that only an underlying mental illness, and not drug addiction standing alone, supports a finding of diminished capacity for purposes of § 5K2.13. Instead, Hunter relies upon a *pre*-Guidelines decision of highly questionable continued validity and applicability to the facts presented here.[7]

In light of the foregoing analysis, this court refuses to depart downward from the sentence range imposed by the Guidelines, under either §§ 5K2.11 or 5K2.13, on the basis of Hunter's severe addiction to narcotics. The court will, however, recommend to the Bureau of Prisons that Hunter be incarcerated at a facility which is capable of treating his drug addiction with intensive therapy.

## IV. CONCLUSION

For the foregoing reasons, the court holds that all five counts against Hunter must be grouped for purposes of determining his sentence, and that it will not depart downward on the basis of Hunter's drug addiction from the sentence range imposed by the Guide-

lines. Consequently, the court will adopt the recommended sentencing range in Hunter's pre-sentence report prepared by the probation department, which properly was calculated by grouping all counts against Hunter, and enhancing his sentence on the firearms-possession count because his firearms were possessed in connection with his drug-trafficking activities.

Accordingly, it is ORDERED as follows:

(1) That the objection of defendant Michael Jon Hunter to the grouping of all five counts against him under U.S.S.G. § 3D1.2(c) for purposes of determining his sentence is overruled; and

(2) That defendant Hunter's request for a downward departure based upon U.S.S.G. § 5K2.11 or U.S.S.G. § 5K2.13 is denied.

## *SUPPLEMENTAL MEMORANDUM OPINION*

At the sentencing hearing for defendant Michael Jon Hunter held on October 28, 1997, the defendant stated his objections to the court's order of October 20, 1997. One of Hunter's objections, that he was subjected to impermissible 'double-counting' when the court grouped the five counts against him in calculating his sentence, warrants additional comment by the court.

Hunter appears to take the position that the court, by grouping his drug counts with his count for felon in possession of weapons, and then subsequently augmenting his sentence on the weapons-possession count based upon the conduct underlying the drug counts, essentially punished him twice for the same conduct, in contravention of the United States Sentencing Guidelines' express intent to avoid such double counting. *See* U.S. Sentencing Guidelines Manual § 3D1.2, comment. (n.5) (1995). Hunter's argument betrays a misunderstanding of the effects of grouping under the Guidelines. It appears to be premised on the mistaken notion that in the process of grouping separate counts pursuant to § 3D1.2(c) *all* counts contribute to

---

7. The government, for its part, attempted to distinguish *Bass* from the facts of the instant case, and establish that subsequent, but pre-Guidelines, decisions have overruled the case. It is

unfortunate that the attorneys representing both parties in this cause failed to cite any relevant case law addressing the specific provisions of the Guidelines that govern this important issue.

the sentence that is calculated upon grouping. In other words, Hunter's argument presumes that the act of grouping his drug counts and his weapons-possession count results in an overall sentence determined by somehow combining the individual sentences due each count, such that the resulting sentence is greater than that required by any single underlying count. If this were an accurate description of how the grouping of counts affects the sentence determination, Hunter perhaps would be correct in asserting that impermissible double counting occurs when grouping of counts is followed by sentence enhancement due to the fact that the conduct underlying one grouped count is a specific offense characteristic of another grouped count.

Fatal to this argument, however, is the fact that § 3D1.2(c) does not function in this fashion. Rather than resulting in a sentence derived by applying a formula that incorporates the offense levels for all of the grouped counts, the grouping provision instead instructs the court to determine the overall offense level exclusively on the basis of the most serious count. *See* U.S.S.G. § 3D1.3(a) ("In the case of counts grouped together pursuant to § 3D1.2(a)-(c), the offense level applicable to a Group is the offense level, determined in accordance with Chapter Two and Parts A, B, and C of Chapter Three, for the most serious of the counts comprising the Group, *i.e.*, the highest offense level of the counts in the Group.") Consequently, all other, less serious, counts are discarded when the court groups counts pursuant to § 3D1.2(c). Subsequent enhancement of that more serious count due to conduct underlying one or more of the less serious, discarded counts cannot therefore be said to constitute double counting; simply stated, that conduct was not accounted for at the time of grouping, because the corresponding count was discarded, so it properly forms the basis of an enhancement of the defendant's overall sentence.

The net effect of the grouping provision, then, is the same as that which would result had the less serious offenses been dropped, and the defendant pled guilty only to the most serious offense. Under such circumstances, the court would nonetheless rely upon relevant conduct principles, as set forth in U.S.S.G. § 1B1.3, to enhance the sentence on the remaining count based upon the conduct underlying the uncharged offenses.